# In the United States Court of Federal Claims

No. 15-953T
(Filed: October 24, 2018)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| CITIGROUP, INC., | Tax refund suit; FIRREA; *Winstar*; Supervisory goodwill; Worthless asset deduction; Reliance damages; I.R.C. § 597; Wounded bank damages; Tax benefit rule. |
| *Plaintiff,* | |
| v. | |
| THE UNITED STATES, | |
| *Defendant.* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Jean A. Pawlow*, Washington, DC, for plaintiff. *Justin E. Jesse* and *Lyndon D. Williams* of counsel.

*Benjamin C. King, Jr.*, United States Department of Justice, Tax Division, Washington, DC, with whom were *Richard E. Zuckerman*, Principal Deputy Assistant Attorney General*, David I. Pincus*, Chief, and *G. Robson Stewart*, Assistant Chief, for defendant.

## OPINION

BRUGGINK, *Judge*.

This case concerns the tax consequences of a damages award paid by the federal government to plaintiff in connection with the savings and loan crisis of the 1970s and '80s. The courts, and this court in particular, wrestled for several decades with the fallout from the federal regulators' and later Congress' attempts, first, to save the industry, and then subsequently their efforts to correct that initial reaction. *See Winstar Corp. v. United States*, 518 U.S. 839 (1996). Plaintiff now seeks a refund of income taxes attributable to a disallowed $798 million dollar deduction for "supervisory goodwill" that it alleges was lost when Congress changed the treatment of that asset in 1989. Plaintiff also seeks a refund of taxes paid on the $381

million judgment obtained earlier in this court as part of the *Winstar*-related litigation.

Pending are plaintiff's two motions for summary judgment. The government contends that trial is necessary to resolve these issues. We agree. Because we do not know the value of all of the intangible assets created by the transaction at issue, trial is necessary as to the first question, and, because we do not know whether Glendale previously deducted any of the specific expenses for which it was compensated for by this court's damages award, trial is also necessary to determine whether the tax benefit rule mandates that the damages award is properly treated as income.

## BACKGROUND

Interest rates in the late 1970s and early 1980s rose rapidly to keep pace with ever-increasing economic inflation. This subjected the savings and loan industry in the United States to serious financial stress. Many savings and loan associations, known as "thrifts," found themselves holding loan portfolios consisting largely of long-term, fixed-rate mortgages at interest rates significantly lower than what these thrifts were forced to pay to attract retail depositors.[1] For many of these banks, the interest service on the short-term deposits overtook the revenues from their long-term loans; they quickly became insolvent.

Federal regulators sought to ease pressure on the industry by reducing capital reserve requirements and changing the required accounting principles to allow a broader definition of capital reserves. This further weakened the stability of many thrifts by encouraging new investment without true capital to shore up the banks in the event of losses.

Faced with specter of impending thrift failures and the resulting losses on federally-insured deposits, the Federal Savings and Loan Insurance Corporation ("FSLIC") and the Federal Home Loan Bank Board ("FHLBB") sought to stem the tide of potential liability by encouraging solvent thrifts to merge with failing thrifts. The resulting transactions were known as "supervisory mergers." When needed, the regulators offered a variety of incentives tailored to each particular transaction to facilitate the acquisition.

---

[1] Thrifts are banks specializing in using savings account deposits to make conventional mortgage loans.

2

These included rights to operate in new states ("branching rights"), the right to amortize goodwill over 40 years, interest rate protection, credit forbearance, favorable loans, cash, debt forgiveness, indemnity provisions, and  the right to count goodwill as "regulatory capital" towards the banks' capitalization requirements.  Not all supervised transactions required federal assistance, however.  Plaintiff here, in fact, acquired several thrifts without FSLIC incentives.

In general terms, the premium paid for an acquired business over what its assets, minus its liabilities, are worth is known as "goodwill."  In the context of these supervisory mergers, the failing thrifts had liabilities exceeding their assets.  The acquiring thrifts were permitted, however, to treat the difference as "supervisory goodwill" and to mark it on their ledgers as capital for the purpose of meeting reserve requirements.  *See id.* at 848-49.  This permitted the acquiring thrifts to meet capital reserve requirements even after assuming new net liabilities while simultaneously allowing the government to shore up the industry without the need to reimburse depositors.

In November 1981, Glendale Federal Bank, FSB ("Glendale"), a California thrift, acquired First Federal Savings and Loan of Broward ("Broward"), a Florida thrift, in a merger supervised by the FHLBB and the FSLIC.  As with any acquisition of one thrift by another, the FHLBB was required to give its approval, and ultimately it did.  The deal was also conditioned upon a Supervisory Action Agreement ("SAA") between Glendale and the FSLIC.  In essence, the acquisition of Broward by Glendale was a tripartite agreement with the United States in that it required an agreement between the Glendale and Broward and an agreement between the United States and Glendale.

The SAA between Glendale and the FSLIC incorporated by reference "any resolutions or letters issued contemporaneously herewith by the FHLBB or the FSLIC" and the merger agreement between Glendale and Broward.  PX 1 at 14.  This court previously held that these incorporated documents include the November 19, 1981 FHLBB Resolution No. 81-710, which approved the merger.  *Statesman Savs. Holding Corp. v. United States*, 26 Cl. Ct. 904, 910 (1992).  The FHLBB resolution required Glendale to furnish an opinion from its independent accountant justifying under generally accepted accounting principles ("GAAP") the "use of the purchase method of accounting for its merger with Broward," recognizing "any goodwill or

3

discount of assets from the merger to be recorded on Glendale's books," and substantiating "the reasonableness of amounts attributed to goodwill and the discount of assets and the resulting amortization periods and methods." PX 2 at A25. Glendale was further required to "submit a stipulation that any goodwill arising from this transaction shall be determined and amortized in accordance with FHLBB Memorandum R-31b." *Id.*

The Supreme Court held that the totality of these documents amounted to a valuable guarantee by the United States that Glendale would be allowed to treat the supervisory goodwill as an asset for regulatory capital compliance purposes. *United States v. Winstar Corp.*, 518 U.S. 839, 863-64, 881 (1996). Included in that promise was a 40-year time period for keeping the goodwill on Glendale's books.[2] Together these promises are known as the "RAP right."[3]

The SAA listed the following obligations of the FSLIC to Glendale as a part of this deal: 1) Interest rate protections; 2) indemnification for damages arising out of litigation against Glendale as a result of the merger, damages suffered as a result of the FHLBB or FSLIC's actions to effectuate the merger, and any amounts paid to satisfy any unknown liability of Broward; and 3) a promise of FHLBB to use best efforts to restructure existing FHLBB loans to Broward. In addition, attached to the SAA was a letter from the

---

[2] As the Court noted, however, these promises were not binding on Congress. Instead, they operated as any contractual promise does when it is for something "beyond the promisor's absolute control, that is, as a promise to insure the promisee against loss arising from the promised condition's nonoccurence." *Winstar*, 518 U.S. at 869.

[3] "RAP" refers to the FHLBB's new set of regulatory accounting principles that it promulgated to supersede GAAP for purposes of compliance with capital reserve requirements in supervisory mergers. *See Winstar*, 518 U.S. at 846. The parties differ as to whether the right to count supervisory goodwill as an asset was part of the RAP right. Defendant posits that it was not, because the purchase method of accounting under GAAP already permitted such a thing. As the Court noted, however, it was not clear from GAAP and the applicable regulations at the time whether the purchase method of accounting was applicable to the acquisition of failing thrifts. *Id.* at 854. The supervisory merger agreements made it explicitly so, and thus made the deals attractive to healthy thrifts. Ultimately it does not matter to our conclusion.

FHLBB promising that any future applications of Glendale to establish or maintain branches in Florida would be treated as if Glendale's home office was in Florida. These are the "branching rights" discussed above.

In 1989, Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 18. (1989) ("FIRREA"), in an effort to solve the Savings and Loan crisis and patch up what legislators viewed as the excesses and errors of the regulators' attempts to meet the crisis. Relevant here, FIRREA ended the favorable treatment of supervisory goodwill as an asset for regulatory purposes, requiring thrifts to phase out the goodwill from core capital over a five-year period. This also had the effect of ending the favorable 40-year amortization period of that goodwill. *See Winstar*, 518 U.S. at 856-57.

Glendale thus found itself out of regulatory compliance with the loss of the goodwill asset. In 1993, it thus began recapitalizing and selling assets, including its entire Florida division in 1994. Glendale survived the effort but incurred significant transactional costs in the process. Joining a wave of thrifts impacted by FIRREA, Glendale filed suit against the United States in 1990 on a breach of contract theory. We ruled for Glendale in 1992, granting summary judgment on liability, finding that FIRREA was a breach of the government's promise to allow the goodwill to be treated as an asset and to be amortized over 40 years. *Statesman Sav. Holding Corp. v. United States*, 26 Cl. Ct. 904, 913-16 (1992) (citing *Winstar Corp. v. United States*, 25 Fed. Cl. 541, 549 (1992)). The liability issue was certified for interlocutory appeal and consolidated with other similar actions. The Federal Circuit eventually affirmed *en banc*. *Winstar Corp. v. United States*, 64 F.3d. 1531 (Fed. Cir. 1995). The Supreme Court agreed a year later. 518 U.S. 839.

The issue of liability having been finally decided, the case returned to this court for the treatment of damages. In 1999, we awarded restitution and "non-overlapping" reliance damages to Glendale in the combined amount of $908,948,000. *Glendale Fed. Bank, FSB v. United States*, 43 Fed. Cl. 390 (1999). The Federal Circuit reversed the restitution award as unfounded in fact, but affirmed the availability of reliance damages and remanded for a proper determination of the quantum. 239 F.3d 1374 (Fed. Cir. 2011). Reliance damages in the amount of $380,787,000 were awarded in 2002, 54 Fed. Cl. 8 (2002), and the Federal Circuit affirmed in 2004, 378 F.3d 1308 (2004), *cert. denied*, 544 U.S. 904 (2005).

Plaintiff attempted to deduct the loss of the supervisory goodwill in 1994-1997 and 2000-2002.[4]  The IRS denied those attempts because, among other reasons, it found that Glendale lacked a basis in the goodwill and because the possibility of recovery in litigation remained until the finality of the lawsuits.  In 1994, Glendale sold its Florida operations (those acquired from Broward) and reported a gain of $200,874,684.  No amount of the goodwill from the Broward merger was included in the basis of the sale of the Florida assets.  The IRS audited Glendale's 1994 tax year but did not propose any adjustment to the amount of gain reported (and thus no adjustment to the basis).

After *certiorari* was denied in 2005, plaintiff again sought to deduct the loss of supervisory goodwill in its tax return for that year.  In its return, Glendale also included $381 million in income representing the reliance damages award from this court.  It paid $545 million in taxes along with its return.  In December 2014, plaintiff filed a claim for a refund for the 2005 tax year, claiming a deduction for the $798 million loss of the supervisory goodwill asset, and a few days later, plaintiff amended that refund claim to include the erroneous inclusion of the $381 million as income.  On May 18, 2015, the IRS denied the claim entirely.  Plaintiff filed suit here on September 1, 2015, claiming a refund of $412,940,394 in overpaid taxes for the 2005 tax year.

DISCUSSION

I.  Worthless Asset - Supervisory Goodwill Deduction

The first motion concerns the tax treatment of FIRREA's change to the legal right to both consider the negative value of the Broward assets as an intangible asset for capital reserve purposes and the right to amortize that asset over a 40-year period.  Plaintiff contends that its own accounting records before and after FIRREA are sufficient to establish the necessary facts: before, it had a $798 million dollar asset on its books, at least for capital compliance purposes, and, after, it had no such asset on its books, and no right to amortize that asset over 40 years.  The disappearance of such an asset

---

[4] In 1997, a series of corporate reorganizations and mergers began, which culminated in the acquisition of Glendale's parent corporation by Citigroup in 2002. We will refer to Glendale and Citigroup interchangeably throughout.

it views as a plainly deductible loss from income for the year in which it was realized.

I.R.C. § 165(a) provides that a taxpayer may deduct "any loss sustained during the taxable year and not compensated for by insurance or otherwise."[5]  The amount of that deduction is the taxpayer's "adjusted basis" in the item lost.  *Id.* § 165(b).  Section 1011 points us to the next section for determining the adjusted basis.  Section 1012 states the general rule for determining the basis: "The basis of property shall be the cost of such property . . . ." *Id.* § 1012(a).[6]  Plaintiff argues that the cost of the supervisory goodwill was the "assumption of liabilities" from Broward, citing *Oxford Life Insurance Co. v. United States*, 790 F.2d 1370, 1374 (9th Cir. 1986) ("Where a taxpayer acquires all the assets of another in a transaction, the amount of a liability assumed is treated as part of the cost of acquiring the tangible and intangible assets received.").

Plaintiff also points to the Federal Circuit's first *Winstar* decision in which the court stated that the government was bound by the SAA "to recognize the supervisory goodwill and the amortization periods reflected in the approved accountants' letter." 64 F.3d at 1541-42. Given that the federal regulators signed off on the Marwick Letter's allocation of most of the purchase price to supervisory goodwill, plaintiff sees the value of that intangible asset as having been clearly established by the contract documents. Further, plaintiff argues that defendant has admitted the critical facts in its answer to paragraph 40 of the Complaint, which reads: "On November 19, 1981, Glendale entered into an SAA with the FSLIC pursuant to which Glendale agreed to assume, through a merger, the government's financial liability."  Compl. ¶ 40.  In plaintiff's view, the deal essentially was that Glendale would assume the liabilities that the FSLIC was otherwise going to face when Broward failed in exchange for the right to count those same liabilities as an intangible asset for capital compliance purposes.  The value of the asset is thus in plaintiff's view the same as the liability assumed.

Defendant responds in two ways.  First, defendant denies that the right to account for the delta between the assets and liabilities of Broward as

---

[5] "I.R.C." refers to the Internal Revenue Code, codified at Title 26 of the United States Code.

[6] Section 1012 provides a number of exceptions to this rule, none of which apply here.

supervisory goodwill was granted as an assistance item by the SAA. Defendant argues that such a right was already permitted by the applicable accounting principles at the time (GAAP). The government urges that plaintiff misreads the case law and instead argues that the assistance with regard to the supervisory goodwill was the right to amortize it over 40 years, the RAP right. Thus, defendant views the SAA as inapposite and not controlling for tax purposes. And, in any event, defendant points out that the law does not permit parties to a transaction to control the tax consequences unless one of the parties is the Secretary of the Treasury, even when one party is a federal regulatory agency. *See, e.g.*, *Centex Corp. v. United States*, 48 Fed. Cl. 625, 632 (2001) (citing, *inter alia*, 26 U.S.C. § 7801 (1994)).

Defendant's second avenue of challenge is with respect to the other particulars of the supervisory merger. It argues that Glendale received more than just the RAP right from the FSLIC as part of the SAA. Defendant points in particular to the income rate protections and branching rights as other particularly valuable intangible assets. Defendant cites trial testimony from Gordon Klett during the original *Glendale* trial in this court, in which Mr. Klett stated that the principle inducement for Glendale to acquire Broward was the right to operate in Florida. *See* DX. 3 at A7, A9. Before an $800 million dollar deduction can be taken, plaintiff must net out the other intangible assets acquired along with the supervisory goodwill to ascertain Glendale's actual basis in that asset, argues defendant.[7] Thus, summary judgment on this record is impossible.

In principle, we agree with defendant. It is undisputed that other rights were granted Glendale in the supervisory merger. At least some of which have an ascertainable value as intangible assets. As defendant pointed out, Treasury Regulation 1.61-6 is relevant:

> When a part of a larger property is sold, the cost or other basis of the entire property shall be equitably apportioned among the several parts, and the gain realized or loss sustained on the part of the entire property sold is the difference between the selling price and the cost or other basis allocated to such part.

---

[7] Other intangible assets, such as the branching rights, survived FIRREA. Had all of the intangible assets from the merger been rendered worthless, the case would be an easier one because no apportionment would be necessary for Glendale to prove its basis.

26 C.F.R. § 1.61-6 (2018). If the price paid for the acquisition of Broward was the negative value of Broward's assets against its liabilities, that amount must account for all assets acquired by Glendale, not all of which were rendered worthless by defendant's breach. We cannot, as plaintiff would have us, restrict our view on valuation, or basis, to the deal between FSLIC and Glendale. Legally, FSLIC was required to recognize the purchase price as goodwill for regulatory purposes, but that is not controlling for tax purposes. The tax laws look at the transaction as a whole. Thus, in order to know the true value of any deduction that Glendale is owed for the loss of one intangible asset, we must know Glendale's basis in all other intangible assets acquired as part of the same deal. A calculus can then be made to reduce the value of the supervisory goodwill by the value of the surviving intangible assets. The record on summary judgment, however, does not contain the necessary valuation information to perform that calculus.

The decisions in Washington Mutual's ("WAMU") two lawsuits attempting to take similar deductions are instructive. WAMU filed suit in 2008 in district court for the Western District of Washington, seeking refunds for tax years 1990, 1992, and 1993 for the loss of branching and RAP rights that were acquired from a series of supervisory mergers in the 1980s.[8] The district court originally held that WAMU had no basis in these intangible assets and thus could not take a deduction for their loss. *Washington Mut., Inc. v. United States*, No. C06-1550, 2008 WL 8422136 (W.D. Wash. 2008). The Ninth Circuit reversed, holding that WAMU's basis "was the excess of the three failing thrifts' liabilities over the value of their assets. Home Savings, therefore, received a cost basis in the branching rights and the RAP rights equal to *some part* of the total amount of that excess liability." 636 F.3d 1207, 1219 (9th Cir. 2011). The case returned to the district court, which held that WAMU's income based valuation approach to the branching rights was unreliable and failed to establish WAMU's basis to a reasonable degree of certainty.[9] 996 F. Supp. 2d. 1095, 1117 (W.D. Wash. 2014). That decision was affirmed in 2017. 856 F.3d 711, 714 (9th Cir. 2017).

---

[8] WAMU claimed the loss of RAP rights as a result of FIRREA and the loss of branching rights as an abandonment loss after it sold all of its offices in Missouri, one of the states in which it had acquired branching rights through a supervisory merger.

[9] The court also held that WAMU failed to establish that it had abandoned the Missouri branching rights. 996 F. Supp. 2d. at 1119-20.

Meanwhile, WAMU also filed suit in this court in 2008, seeking similar refunds for tax years 1991, 1994, 1995, and 1998 for the loss of RAP and branching rights.  Judge Griggsby held that, as a matter of collateral estoppel, plaintiff was faced with the same legal framework in proving its basis.  *Washington Mutual, Inc. v. United States*, 130 Fed. Cl. 653, 689 (2017).  She also held that the cost basis for all of the assets acquired in the mergers in question was established as the excess of liabilities over assets, but found, as had the district court, that WAMU had not proven the value of the RAP and branching rights.  *Id.* at 694-95, 700.

The Federal Circuit affirmed that decision earlier this year.  It began its discussion with the statement that "there is no dispute that [plaintiff] had *some* cost basis in its RAP and branching rights collectively, and that [WAMU] is entitled to a tax refund *if* it can allocate the cost basis to each of those rights individually."  *WMI Holdings Corp. v. United States*, 891 F.3d 1016, 1021 (Fed. Cir. 2018).  In order to do so, it had to establish the fair market value of each asset for which it claimed a loss, but it was not required to do so with "absolute precision." *Id.* at 1022.  The Federal Circuit ultimately agreed on each point, including the holding that the RAP right was not a contractual promise that WAMU's predecessor be allowed to treat the excess of liabilities as goodwill.  Instead, the court stated, as did this court below, that the nature of the RAP right was a regulatory guarantee that the purchase be allowed to continue to account for that asset as it had and to amortize it for 40 years should the financial regulations change in the future.  *Id.* at 1025.  This was, in essence, an insurance against loss if the law changed.  The purchase method of valuation that required the treatment of goodwill as an asset was already in place prior to the SAA.  *Id.*  The import of the holding was that WAMU's valuation was premised on the flawed assumption of a contractual right to treat the goodwill as an asset.  *Id.* at 1026.

The Federal Circuit also affirmed Judge Griggsby's holding that WAMU's income method of valuing the branching rights was unreliable.  *Id.*  As this court stated, the data on which those models were based was outdated or inapposite.  The Federal Circuit found no error in those conclusions.  *Id.* at 1026-27.  The court also made an important point in rejecting WAMU's argument that this court erred in rejecting the branching rights valuation due

to the failure to establish the value of the RAP rights.[10]  The court rejected that argument out of hand, noting that, in order for it to have any traction, the taxpayer would have to show that only the RAP and branching rights were acquired in the supervisory mergers.  "[A]s the government points out, the failing thrifts' traditional goodwill could also absorb some of the cost basis, even if such goodwill would have been of low value during the savings-and-loan crisis."  *Id.* at 1028 (citing *Desert Mgmt. Corp. v. United States*, 112 Fed. Cl. 438, 450-51 (2013)).

Although the circumstances of the WAMU cases are distinct— WAMU sought a deduction for branching rights and RAP rights, and there were more supervisory mergers at issue—the legal principles behind those decisions mandate the result in this case.  The parties here agree with the Ninth Circuit and the Federal Circuit that the purchase price is the excess of liabilities over assets.  Plaintiff claims a deduction for the loss of the goodwill asset.  It values that asset as the entire purchase price (liabilities over assets) because the purchase method of accounting allowed it to be treated as such for capital compliance purposes.  The result is not the same for tax purposes, however.  The concept of basis, as the Ninth Circuit explained, is fundamental and "refers to a taxpayer's capital stake in an asset for tax purposes."  636 F.3d at 1217.  The basis in an asset is its cost to acquire, including any liabilities assumed.  *Id.*  "Where a taxpayer acquires all the assets of another in a transaction, the amount of liability assumed is treated as part of the cost of acquiring the tangible and intangible assets received." *Oxford Life Ins. Co.*, 790 F.2d at 1374.  Because there is no doubt that other rights were acquired in the Broward merger, and because the parties do not agree on the basis allocable to those rights, we cannot assume that the basis of the supervisory goodwill alone accounts for the entire purchase price.  Summary judgment on this issue is thus inappropriate.

---

[10] As an alternative basis for her holding on the branching rights issue, Judge Griggsby also held that the failure to establish the value of the RAP rights cast doubt on the value of the branching rights because WAMU's expert had stated that he determined the purchase price of the mergers "based on the determined fair market value of each item of government assistance provided in those mergers."  130 Fed. Cl. at 695.

II. Reliance Damages As Income

We turn now to the second item for which plaintiff claims a refund, which is the subject of its second motion for summary judgment.  Plaintiff claims that it is owed a refund for tax paid on the reliance damages originally awarded by this court, which were paid in 2005 after all appeals were final. Citigroup included the award of $381,538,696 as income in its return for the 2005 tax year.  It now seeks to reverse that position and asserts that the recovery was erroneously included in income.  Plaintiff argues that the damage award is statutorily exempt from taxation and, in any event, does not otherwise represent an accretion of wealth.  Under either approach, the award is not income and should not be taxable.  Defendant disagrees, as with the first issue, contending that material issues of fact preclude summary judgment under either of plaintiff's theories, particularly pointing to the tax benefit rule as potentially implicated by plaintiff's claim.  We begin with plaintiff's statutory argument.

A.  Section 597 Does Not Apply

Plaintiff's first argument is that the damages award is excluded from gross taxable income pursuant to I.R.C. § 597, which read as follows at the time that the SAA was formed:

> Exclusion from gross income. Gross income of a domestic building and loan association does not include any amount of money or other property received from the Federal Savings and Loan Insurance Corporation pursuant to section 406(f) of the National Housing Act (12 U.S.C. sec. 1729(f)), regardless of whether any note or other instrument is issued in exchange therefor.

26 U.S.C. § 597(a) (1988).  The parties agree that this provision creates an exemption from taxation for FSLIC assistance items.  FIRREA subsequently amended section 597 to include assistance items within taxable income, but treasury regulations clarify that assistance items received on or after May 10, 1989 relating to an acquisition occurring before that date continue to be governed by the version of section 597 in force at the time of acquisition.  26 C.F.R. § 1.597-8(b)(1) (2018).  Thus the version of the statute cited above controls here.  The regulations also make clear that payments received in lieu

of assistance items are covered by this section and thus not included in taxable income. *Id.* § 1.597-8(b)(2).

Plaintiff argues that this court's damages award is such a payment in lieu of a FSLIC assistance item. It sets up the following syllogism. The major premise is that the right to count the negative value from the Broward acquisition as supervisory goodwill was received from the FSLIC as a cash substitute to induce Glendale to acquire Broward. This then should be viewed as an assistance item, or "other property" as stated in the statute. The minor premise is that this assistance item was rendered worthless by FIRREA; the conclusion drawn is that any compensation for that loss awarded by the court is a payment in lieu of the assistance item.

Defendant disagrees with both premises, but argues that a trial is, in any event, necessary to decide whether the supervisory goodwill was an assistance item per the terms of the SAA and whether any provision of the SAA controls the tax treatment of a subsequent damages award. We do not agree with either party. No trial is necessary on this aspect of plaintiff's motion because the reliance damages award is not exempted from taxation by section 597.

The conclusion is wrong as a matter of law.[11] Reliance damages are compensation given to the non-breaching party for the economic harm caused by acting in reliance on the breaching party's promise to perform. *Glendale*, 239 F.3d at 1382-83 (citing Restatement (Second) of Contracts § 344(b)). The measure of reliance damages is the cost incurred but for the breached contract, minus any loss that would have occurred anyway. Restatement (Second) of Contracts § 349. Unlike expectancy damages, reliance damages are not a measure of the economic value of the promises to the non-breaching party had the other party performed. Thus they are not in any sense a payment in lieu of receiving a contractual promise, here the

---

[11] The major premise is also incorrect. As Federal Circuit recently explained, the government did not grant the supervisory goodwill as part of the supervisory merger. It simply guaranteed the continued treatment of that asset as it was accounted for under GAAP at the time. *WMI Holdings Corp.*, 891 F.3d at 1025.

assistance items.  Those are expectancy damages, which were not part of the award.[12]

Plaintiff was awarded damages that primarily compensated Glendale for the increased cost of borrowing it faced after its ledgers were impacted by the elimination of a nearly-$800 million dollar asset (supervisory goodwill).  Glendale's own damages expert coined the phrase "wounded bank damages" to describe the bulk of the loss that Glendale suffered due to the government's change of the rules as to how supervisory goodwill could be accounted for and amortized.  These wounded bank damages represented the loss of Glendale's "historic advantage in cost of funds over its competitors" after it fell out of regulatory compliance due to FIRREA.  43 Fed. Cl. at 408.  Glendale's expert testified that the failure to maintain regulatory compliance caused Glendale to increase its rates to attract and keep depositors, i.e., its cost of funds increased.  The court agreed and awarded $335.4 million for this loss.  The court also awarded another $45 million in reliance damages corresponding to increased deposit insurance premiums, Office of Thrift Supervision assessments, and other transactional costs incurred due to Glendale's need to recapitalize and right its balance sheets after FIRREA.  These damages do not bear a direct correspondence to any assistance item promised by the FSLIC; they are connected only because plaintiff suffered losses from an unanticipated breach (failure to provide such assistance items).  These reliance damages are thus not payments in lieu of an assistance item from the FSLIC and are therefore not exempt from taxation under I.R.C. § 597.  Summary judgment cannot be granted on this basis.

## B.  Reliance Damages Represent a Return of Capital

Plaintiff also argues, irrespective of section 597's applicability, that its reliance recovery was not taxable because it was not income.  Plaintiff's position is that reimbursement for costs incurred as a result of the breach is not an accretion of wealth (income).  The damages represent instead only a return of capital lost, which is not taxable.

---

[12] "[T]he injured party has a right to damages based on his expectation interest as measured by (a) the loss in the value to him of the other party's performance caused by its failure or deficiency . . . ."  Restatement (Second) of Contracts § 347.

Defendant responds that the current record is insufficient to determine whether plaintiff is correct that the award was not an accretion to wealth. Other than the potential application of the tax benefit rule, discussed below, it is not clear from defendant's papers what factual issues prevent summary judgment.[13]   Rather, we agree with plaintiff as a general matter that a damages award which only compensates for lost capital is not usually taxable because such an award is not a realization of income.  *See, e.g., Freeman v. Comm'r Internal Rev.*, 33 T.C. 323, 327 (1959) ("If the recovery is received as the replacement of capital destroyed or injured rather than for lost profits, the money received is a return of capital and not taxable.").   This rule is dependent on the facts and circumstances of each case, or as the Tax Court put it, "the nature of the claim and the actual basis of recovery."  *Id.*

I.R.C. § 61 provides a broad definition of gross income, stating that it "means all income from whatever source derived."   Inherent in this broad definition is the principle of economic gain.   "For a taxpayer to have income under section 61, there must be an economic gain that benefits the taxpayer."  Rev. Rul. 81-277, 1981-2 C.B. 14; *see also United States v. Gotcher*, 401 F.2d 118, 120 (5th Cir. 1968).

Plaintiff argues that Glendale's damages award is merely the replacement of capital lost in two forms.   The wounded bank damages were, according to plaintiff, compensation for the impact on Glendale's capital structure, which the court measured by way of the increased cost to borrow after the loss of capital reserve compliance.   The other reliance damages were reimbursement for costs incurred as a result of the breach, such as OTS fees and transaction costs from recapitalization.   None of these items, according to plaintiff, represent an award of new money to plaintiff (income) because there was no net economic gain to Glendale.

Defendant does not disagree with the legal principles on which plaintiff relies, but argues that factual differences make the cases plaintiff cites inapplicable to the present circumstances.   The government does suggest that the mere fact that the award was one of reliance damages is not, by itself, controlling.   It cites *Raytheon Production Corp. v. Commissioner of Internal Revenue.*, 144 F.2d 110 (1st Cir. 1944), for the proposition that,

---

[13] It was not entirely clear until after the court posed several questions for supplemental briefing how defendant viewed the application of the tax benefit rule to plaintiff's second motion for summary judgment.

although a suit may not be for lost profits, some gain may have been realized by the conversion of a company's goodwill into cash.  Defendant's point is, we presume, that there is some gain over basis inherent in the wounded bank damages to plaintiff, but that is not clear from its brief.

In *Raytheon*, the First Circuit was presented with the tax consequences of a settlement of an earlier antitrust suit by *Raytheon* against a third-party. The IRS had included the $410,000 settlement amount as income.  The Tax Court held that the settlement agreement itself provided no attribution as between damages to capital and other types of compensation, such as lost profits, and thus no basis for exclusion from income was present.  The circuit court affirmed, holding that, although the trial record of the original lawsuit contained no indication that lost profits were at issue, that was not dispositive because there might otherwise have been an accretion of wealth from the conversion of property (goodwill of the business) into cash.  144 F.2d at 114. The court stated that "compensation for the loss of Raytheon's good will in excess of its cost is gross income." *Id.*  The record contained no evidence on which to ascertain Raytheon's basis in the goodwill, and thus the court affirmed the Tax Court's finding that there was nothing in the record on which to overturn the IRS's inclusion of the settlement amount in the gross income of the taxpayer. *Id.*

*Raytheon* is inapposite.  The award of reliance damages to Glendale was for specific expenses incurred as a result of the contract and the breach. Despite plaintiff's phraseology, "injuries to Glendale's capital structure," which its expert stated included "goodwill," the actual measure of damages was the increased interest rates that plaintiff paid.  There was no conversion of property into cash such as the circuit court hypothecated in *Raytheon*. Likewise, compensation for transactional costs for recapitalization and the sale of assets represents no net economic gain.  The same is true of deposit insurance premiums.  These items are not ordinarily considered income. There is only one possible exception: if those expenses awarded as damages had already been deducted in a prior tax year.  This is known as the "tax benefit rule."

C.  The Tax Benefit Rule

Defendant invokes the tax benefit rule, which is a rule of judicial creation that will not allow the exclusion of an item from income if it represents a recovery for a loss that has already been deducted from income

16

in a prior year.  *See generally Hillsboro Nat. Banks v. Comm'r of Internal Rev.*, 460 U.S. 370, 383 (1983).  The rule only applies, however, when "a careful examination shows that the later event is indeed fundamentally inconsistent with the premise on which the deduction was initially based." *Id.* at 184.  Defendant avers that the record is not clear whether the specific items for which reliance damages were awarded were deducted by Glendale prior to 2005.  It suggests that they likely were—banks generally deduct the interest paid on deposits as a matter of course, for example—and thus argues that trial is necessary because the record leaves the question unanswered.

Plaintiff responds that there was no tax deduction associated with the wounded bank damages because those were not a reimbursement "for any specific expense incurred and deducted by Glendale on its federal income tax returns."  Pl.'s Second Mot. for Summ. J. 29.  Instead, plaintiff argues that Glendale's expert used an estimated historic cost of funds and estimated increased cost of funds "to approximate the injury to Glendale's financial standing, credit, reputation, goodwill, and capital caused by the government's breach." *Id.* at 30.  Plaintiff urges that there is no evidence that these amounts represent actual interest payments or the payments actually previously deducted.  Plaintiff cites extensively to the testimony of its former expert at trial to show that he was not using actual amounts of interest paid as an input to his calculation of damages.  Plaintiff also states, without citation, that it did not deduct the recapitalization costs of $24,235,000, but instead those costs were capitalized.  The status of the balance of the reliance damages is also not clear.  Plaintiff's papers state no position as to the inclusion of its increased deposit insurance premiums, OTS assessments, transaction costs from the sale of a subsidiary bank, and fees paid to the FHLBB.[14]

After the initial briefing and oral argument we asked the parties to brief, among other things, the question of whether, assuming plaintiff was correct that reliance damages are not income, the court needed to consider the tax benefit rule.  We also asked the parties who bore the burden of proving

---

[14] It is important to note that the primary argument plaintiff relies on to shield its reliance award is section 597, which we have already rejected as a basis of excluding these amounts from income.

17

that an item should be included in income, known as the "inclusionary component of the tax benefit rule."[15]

Plaintiff answers the first question in the negative, arguing that the tax benefit rule is an equitable defense that was not pled and thus has been waived. It urges that defendant is in essence asking for a setoff against plaintiff's refund claim by invoking the rule, and a setoff must ordinarily be pled in the answer or as a counterclaim. Plaintiff answers the second question by stating that the burden to prove a setoff is on defendant.

Defendant answers the questions differently. As to whether the tax benefit rule might apply to an award of reliance damages even if those damages were not income, the government answered that the rule might apply if the elements of a "tax benefit" were met (and trial is necessary to make that determination). It also argues that plaintiff bears the burden to prove the inclusionary component of the rule because plaintiff bears the burden in any tax refund suit to disprove the IRS's determination of tax liability.

1. Defendant's Invocation of the Rule is not a Setoff

We begin with plaintiff's assertion that the tax benefit rule is a defense, or a setoff, that must be pled affirmatively by the government. If plaintiff is correct, of course, defendant may not rely on it to defeat summary judgment because it has not pled the defense. We find no support, however, for this proposition in the code or the case law. The tax benefit rule is a judicial attempt, now partially-codified, to reconcile the transactional realities present in any commercial endeavor with the necessity of tax accounting on a yearly basis. *See Hillsboro*, 460 U.S. at 381-82. When applicable, the courts apply the rule to protect the public's interest in not permitting taxpayers to receive a windfall from the deduction of a loss on a transaction in one year and then receiving tax-free compensation as reimbursement for that same loss in a subsequent year. It need not be pled

---

[15] There is also an exclusionary component of the rule, which is partially codified at 26 U.S.C. § 111(a). This application excludes from gross income monies subsequently recovered but for which the earlier deduction did not confer a tax benefit. *See Hillsboro*, 460 U.S. at 388. Plaintiff has not argued the exclusionary component at the summary judgment stage.

for the court to consider its application.  The question of the application of the rule is thus properly before us.

## 2.  Whether the Expenses Were Previously Deducted

The question of who bears the burden of proving the inclusionary component of the tax benefit rule is answered the same as any other issue in a tax refund suit.  The taxpayer bears the burden of proving the IRS's determinations incorrect.  *WMI Holdings Corp.*, 891 F.3d at 1021-22.  Thus, if the question of whether the taxpayer received a prior tax benefit is raised, the taxpayer must establish by a preponderance of evidence any factual predicates necessary to show that rule does not apply.  Here the predicate necessary to conclude in plaintiff's favor is that the same losses for which Glendale was compensated for by the reliance damages award were not previously deducted from income.[16]  We find that defendant is correct that the record lacks the necessary factual support to make that determination.

Plaintiff's damages expert in the *Glendale* trial, Dr. Baxter, calculated the wounded bank damages by comparing Glendale's historic 0.18 basis points advantage in rates it had to offer to depositors with the actual rates it was forced to pay after Glendale fell out of capital compliance in 1992.  That difference was calculated for each quarter from September 1992 through December 1996.  He then multiplied those excess cost of funds figures for each quarter by the amount of Glendale's "Average Funding Liabilities" each quarter.  The result of that math was $311.5 million.  Assuming that amount as available to meet other liabilities during that period had Glendale not been forced to pay it as extra interest on deposits, Dr. Baxter calculated an additional $23.9 million in interest that Glendale paid on liabilities that it would not have paid had the $311 million available to meet those liabilities.  The total wounded bank damages figure was thus computed by Dr. Baxter to be $335.4 million.

Plaintiff characterizes these calculations as "hypothetical" and argues, as mentioned above, that these figures do not correspond to actual interest

---

[16] Or plaintiff could show that I.R.C. § 111's exclusionary component of the tax benefit rule applies by establishing that Glendale received no tax benefit from the deductions made in prior years.  Presumably plaintiff would have argued the exclusionary component in its motion if it thought it applicable, but the issue is preserved for trial nonetheless.

expenses deducted by plaintiff for any of the years at issue. Defendant questions this characterization, citing to this court's statement that the reliance damages awarded were for "actual, ascertainable damages." 54 Fed. Cl. at 14 (after remand, the court reinstated its earlier reliance damages total on a motion for entry of judgment). Defendant also points to several of plaintiff's SEC filings for the years at issue, which indicate that interest expenses were deducted. It thus concludes that trial is necessary to determine whether any of the expenses for which plaintiff was recompensed by this court were previously deducted.

We agree with defendant. Be it as it may that plaintiff's expert was not in fact comparing interest statements pre and post-Glendale's loss of capital compliance caused by FIRREA, what he did figure was very much a component of actual expenses almost certainly deducted by Glendale in the years they were paid. Dr. Baxter computed the increased cost of borrowing during those years that FIRREA caused Glendale to be out of regulatory compliance.[17] If plaintiff deducted the actual interest that it paid during those years, Glendale's rates having risen in fact due to the loss of regulatory compliance, as Dr. Baxter testified that they did, those amounts deducted would necessarily encompass the premium that Glendale had to pay after FIRREA and before it recapitalized. It is plaintiff's burden to establish that it did not deduct the extra interest that it had to pay as a result of FIRREA in order to avoid the tax benefit rule. Citation to Dr. Baxter's testimony is insufficient to establish the point given what Dr. Baxter was attempting to measure and the evidence supplied by defendant that interest was deducted.[18]

Of course, if we concluded that the damages award was not fundamentally inconsistent with the deduction, summary judgment would be appropriate because it would not matter whether plaintiff has previously deducted the losses for which it was compensated in the damages award. But we cannot reach that conclusion here.

---

[17] We view what Dr. Baxter did as a shortcut to computing actual extra expenses incurred by eliminating the need to actually compare statements before and after FIRREA.

[18] This holding applies to the $311.5 million calculated as the actual increased rates paid. The other items of reliance damages are also set for trial on whether they were deducted, including the second component of Dr. Baxter's wounded bank damages, the $23.9 million of extra interest paid on other liabilities.

Plaintiff argues that because the enactment of FIRREA was an unanticipated breach of contract, recovery for that breach is not fundamentally inconsistent with the deduction of ordinary expenses, such as the interest paid by Glendale on deposits.  In other words, plaintiffs were not planning for nor trying to achieve any windfall—Glendale took its normal deduction of operating expenses but was forced by FIRREA to sue the government to attempt to recover losses brought about by the change in treatment of supervisory goodwill.

Plaintiff cites the Supreme Court's *Hillsboro* decision as instructive as to how the court should view these events.  In *Hillsboro*, the Court stated that the aim of the rule was "to protect the Government and the taxpayer from the adverse effects of reporting a transaction on the basis of assumptions that an event in a subsequent year proves to have been erroneous."  460 U.S. at 383.  The court went on to state that the application of the rule does not always follow an unforseen (at the time of the deduction) later recovery of a deducted loss.  *Id.*  "The tax benefit rule will 'cancel out' an earlier deduction only when a careful examination shows that the later event is indeed fundamentally inconsistent with the premise on which the deduction was initially based."  *Id.*  This, the court stated, is another way of saying that, had the recovery happened in the same year as the loss, "it would have foreclosed the deduction."  *Id.* at 384.

In *Hillsboro*, two cases were consolidated for consideration.  Plaintiff urges that we consider the facts of the companion case in which the taxpayer, Bliss Dairy, Inc., took a normal business expense deduction under I.R.C. § 162(a) (deduction for consumed materials or supplies).  The relevant asset was cattle feed.  Instead of actually consuming the feed, the corporation liquidated its assets in a planned reorganization.  The assets of the company were distributed to the shareholders of the corporation.  The Court held that the deduction and later distribution of the assets were fundamentally inconsistent with one another because distribution of corporate assets to shareholders in a planned liquidation was a conversion from business use to personal use.  *Id.* at 395-96.  Plaintiff here avers that the facts of this case are distinguishable because the enactment of FIRREA was unanticipated and not planned by the taxpayer.

Plaintiff asks this court to compare the Bliss Dairy results in *Hillsboro* with a Tax Court decision in which the petitioners were farmers who

deducted under section 162 the cost of certain supplies to be used in 2010. *See Estate of Backemeyer v. Comm'r of Internal Rev.*, 147 T.C. 526 (2016). Mr. Backemeyer died before actually consuming any of the supplies.  All of Mr. Backemeyer's assets, including the farming supplies, passed to a trust of which his widow was the trustee.  Mrs. Backemeyer then continued to operate the farm.  She took an in-kind distribution of the supplies from the trust and consumed them during the normal course of farming in 2011.  She also deducted the cost of those supplies from her income in 2011.  The IRS issued a notice of deficiency, disallowing the deduction of those supplies.

Before the Tax Court, the IRS argued that the tax benefit rule should control the outcome because the distribution of the assets to the trust upon Mr. Backemeyer's death was a conversion from business to personal use, which was inconsistent with the business expense deduction of section 162. *Id.* at 534.  The Tax Court held otherwise, stating that the death of Mr. Backemeyer was not an inconsistent subsequent event that would render the original deduction improper had it been taken in the same year as the distribution to the trust upon Mr. Backemeyer's death.  *Id.* at 543-44. Plaintiff believes its own case is analogous to that of the Backemeyers'.  It likens the breach of contract to the death of Mr. Backemeyer, a wholly unanticipated event, which is thus not fundamentally inconsistent with the deduction, making the tax benefit rule inapplicable.

If defendant is correct that some or all of the amounts deducted as expenses correspond with the damages award, the tax benefit rule will apply. Plaintiff has misconstrued which events are relevant to the application of the rule.  The question is not whether the breach was fundamentally inconsistent with the deduction of those expenses; rather, it is whether the recovery of some or all of those expenses as a damages award in the same year that they were deducted as business expenses would be consistent.  We hold that the two are inconsistent.  This case is not analogous to that of *Backemeyer*. Death is perhaps the clearest example of when the unanticipated event is not inconsistent.  Here we see no such intervening event.  Had Glendale received the damages award in the same year it deducted the expenses—assuming it did deduct some or all of them—it would have been inconsistent with the deduction of those expenses because it would have been counting as a loss something for which it had already been compensated.  This result is consistent with the code's general treatment of insurance and other compensatory payments.  Section 165, which covers deductible losses in general, only allows deductions "not compensated for by insurance or

otherwise."[19]  I.R.C. § 165 (2012).  We must have trial to determine what was deducted by Glendale to know whether the inclusionary component of the tax benefit rule applies.

CONCLUSION

Because the question of Glendale's basis in the various assistance items received from the FSLIC is open and because the question of whether Glendale took deductions for any of the expenses recompensed by this court's reliance damages award is also open, summary judgment cannot be granted to plaintiff on either issue.  Accordingly, the following is ordered:

1.  Plaintiff's motion for partial summary judgment, filed on June 30, 2018, and plaintiff's second motion for partial summary judgment, filed on July 5, 2018, are denied.

2.  The parties are directed to consult and file a joint status report on or before November 16, 2018, with a proposal for further proceedings.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

---

[19] Section 186 of the code also provides further support for the notion that the code does not treat damages for breach of contract as consistent with a deduction for the same losses later awarded as damages.  I.R.C. § 186 allows a separate deduction of the lesser of the damages award or the net-operating loss, after the damages award, as a result of a breach.  The code thus specifically contemplates damages awards for breach of contract separately. Although our holding that the reliance damages award is not income because it only represents a return of capital renders section 186 inapplicable, the code provision is instructive on the question of whether the subsequent recovery of damages is inconsistent with an earlier deduction of expenses caused by the breach.

23