# In the United States Court of Federal Claims

No. 15-953T

(Filed: November 29, 2023)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

CITIGROUP, INC.,

    *Plaintiff*,

  v.

THE UNITED STATES,

    *Defendant.*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

    *Jean A. Pawlow*, Washington, DC, for plaintiff.

    *Benjamin C. King, Jr.*, Attorney of Record, United States Department of Justice, Tax Division, Washington DC, with whom were *David A. Hubbert*, Deputy Assistant Attorney General, *David I. Pincus*, Section Chief, *G. Robson Stewart*, Assistant Chief, for defendant.

## ORDER

BRUGGINK, *Judge*.

    After resolving the remaining fact and legal issues in this case at trial, we are left with a disagreement as to the amount of the tax refund owed to plaintiff. The issue stems from a mismatch between the law of contracts, tax, and perhaps also accounting norms, a disconnect that is only made worse when the breaching party is the federal government—the regulator and the taxing authority. Although both areas of law aim to achieve ends that roughly comport with economic realities, here, the tether is stretched very thin.

    Glendale, Citigroup's predecessor, was induced by federal regulators to absorb a failing Savings & Loan bank (Broward) in large part due to promises of favorable regulatory and accounting treatment. Broward had

liabilities exceeding assets of nearly $800 million in 1981. As we held at trial, the accounting rules of the day permitted Glendale to record these excess liabilities as an asset ("supervisory goodwill") and to amortize the asset over the maximum allowable period, 40 years. The government promised Glendale that this would be permitted and further guaranteed that Glendale could use this asset for regulatory capital compliance purposes. This set of promises is known as the "RAP right."

When Congress became aware of this and similar arrangements approved by regulators to prop up the failing S&L industry, it changed the accounting and regulatory treatment of supervisory goodwill by ending the use of supervisory goodwill as capital for reserve requirements and by requiring that it be amortized off the banks' books within five years, effectively repudiating the deal with Glendale. Suddenly bereft of the "asset" it had on its books and no longer able to reap the rewards from the long amortization period, Glendale was forced to recapitalize through various measures and to pay higher premiums to borrow money until it could sufficiently reorganize and regain its capital reserve compliance status. It therefore brought suit, along with other similarly situated banks, against the federal government in its contracting role for breach of contract. The government asserted a number of defenses unique to it as a sovereign regulator.

The issues ultimately required resolution by the Supreme Court. The Court was faced with the difficulty of balancing the government's interests in regulating through legislation, which were often inconsistent with the public's interest in relying on the government as a contracting party. In this circumstance, the interests were inconsistent and the Court concluded that it was the government which should make the banks whole. In doing so, it also had to explain how the promises of federal regulators could be squared with the legislature's abrogation of those rights. In our constitutional republic of enumerated and separated powers, the only answer left to it was to hold that the promises from the Federal Savings and Loan Insurance Corporation ("FSLIC"), the regulator here, were enforceable as financial guarantees but did not preclude changes in regulation. *United States v. Winstar Corp.*, 518 U.S. 839, 869-70 (1996).

That construction of the contract and balancing of the government's dual roles solved the riddle for contract law purposes. The banks then were left to collect damages, to the extent proven, for the government's breach.[1]

---

[1] In the contract law context, it made little difference whether the promise

2

Glendale did so and was awarded nearly $381 million in reliance damages. Not included in those damages was any recompense for the loss of the supervisory goodwill. Judge Smith originally awarded over $908 million in damages, which included restitution for the amount of net liabilities that Glendale absorbed, less the value of benefits to Glendale, which would be an approximation of the value of the supervisory goodwill. *Glendale Fed. Bank FSB. v. United States*, 43 Fed. Cl. 390 (1999). The Federal Circuit reversed the latter restitution award, holding that Glendale did not in fact suffer any loss by absorbing Broward's liabilities because interest rates subsequently rose. The market value of the assets acquired from Broward thereby increased, lowering, if not eliminating, the delta between assets and liabilities. 239 F.3d 1374, 1382-83 (Fed. Cir. 2001).

This left open the question, for tax purposes, of what became of the supervisory goodwill "asset" on the books of Glendale. Glendale removed the supervisory goodwill from its books, as directed by FIRREA, and recapitalized to meet capital reserve requirements.[2] It then sought a deduction from income for the now-missing asset. The IRS first rejected the deduction on the grounds that Glendale had no basis in the supervisory goodwill. We do not know whether that was due to a similar view as that of the Federal Circuit that the rise in interest rates had in some way reduced the basis. The question of the calculation of basis was thus taken to the courts.

The issue first came to a head in court in the Western District of Washington when Washington Mutual attempted to take a similar deduction stemming from mergers that its predecessor-in-interest, Home Savings Bank, had undertaken in coordination with FSLIC. The district court agreed with the government, holding that the plaintiff there had no basis in the package of rights granted by the government because the bank was insured by FSLIC. In essence, the liability was shared between both parties but would ultimately be borne by the government should the merged entity fail. *Wash. Mut., Inc. v. United States*, No. C06-1550, 2008 WL 8422136, at *6-7 (W.D. Wash., Aug. 12, 2008). That conclusion was reversed by the Ninth Circuit, which held that the bank's basis in the package of promises from the government—

---

was for specific regulatory treatment or just a guarantee against loss if that treatment ended. When Congress changed the law, it did not compensate the banks. Thus, they could enforce that promise, however cabined, through a breach suit, which they did.

[2] The Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub L. 101-73, 103 Stat. 183.

the RAP right and branching rights—was equal to its cost of acquiring the failing thrift. 636 F.3d 1207, 1219 (9th Cir. 2011). The court does not appear to have been presented the issue of how the subsequent rise of interest rates affected the bank's basis in the RAP right (the value of the underwater assets that presumably regained much of their value). Washington Mutual ultimately did not recover on its refund claim because it failed on remand to prove the value of those rights in order to allocate them proportionately within the purchase price to arrive at a proper figure for basis. 856 F.3d 711 (2017). Importantly, however, had Washington Mutual been able to prove Home Saving's basis in those two rights—per the Ninth Circuit's holding that it would have some basis in those rights reflected in the purchase price that Home Saving's paid to acquire the failing thrifts—it would have been owed a deduction for their loss after FIRREA.

That same view of these transactions was adopted by this court and the Federal Circuit in litigation stemming from another of Washington Mutual's predecessor's thrift acquisitions. *See Wash. Mut., Inc. v. United States*, 130 Fed. Cl. 653 (2017), aff'd sub. nom. *WMI Holdings Corp. v. United States*, 891 F.3d 1016 (Fed. Cir. 2018). Washington Mutual again pursued a similar tax deduction for the loss of the RAP rights and branching rights garnered in several other mergers in other states, this time in the Court of Federal Claims. It appears that again the government did not argue against the acquiring thrift's basis in the RAP right on the grounds that the rise in interest rates after the merger increased the value of the mortgages, thereby reducing or eliminating the purchase price. Washington Mutual faired no better here because it again failed to satisfactorily prove its basis in those rights.[3] *WMI Holdings Corp.*, 891 F.3d at 1030 (affirming this court's finding that plaintiff had failed to meet its burden of proving its value in the RAP and branching rights). In affirming that conclusion, the Federal Circuit reiterated that Washington Mutual would have been entitled to a deduction if it could have proven its basis in each of the rights individually. *Id.* at 1021, 1030.

Citigroup, however, fared better in its quest. We applied the rubric set out by the Ninth and Federal Circuits: the purchase price was the assumption of net liabilities. Because the evidence did not show a loss of all of the value of the rights plaintiff acquired, especially the branching rights

---

[3] As we noted in our trial opinion, one of plaintiff's experts here, Dr. Mann, testified for the government and was instrumental in disproving Washington Mutual's income-based approach in its district court suit. *See Wash. Mut., Inc. v. United States*, 996 F. Supp. 2d. 1095, 1116-17 (W.D. Wash. 2014).

4

unaffected by FIRREA, trial was necessary to show a loss and to value what was lost. *Citigroup, Inc. v. United States*, 140 Fed. Cl. 283, 290 (2018).

At trial, defendant's overarching defense was that plaintiff did not suffer a loss of the RAP right because, as only a financial guarantee, plaintiff did not lose that right by the passage of FIRREA. And that, in fact, Judge Smith's earlier damages award was evidence that the value of that promise was retained post-FIRREA. We found that plaintiff proved the value of the RAP right. In response to the government's argument against loss, we attempted to explain how, even if viewed as enforcing the RAP right, Glendale's award of reliance damages could only be attributed to part of the RAP right. 166 Fed. Cl. 748, 759 n.17 (2023). We then asked the parties to compute the applicable tax deduction based on our finding of value for the RAP right.

The government, however, seizing on footnote 17, urges that we found only a partial loss of the RAP right and suggests that, although no evidence was adduced at trial for the isolation of the amortization portion of the RAP right, we could figure its value by subtracting Judge Smith's reliance damages award from the value we found for the RAP right, which would ultimately leave plaintiff with a tax deduction value reduced by over $100 million. Plaintiff opposes any such reduction on the basis that we have already held that the RAP right was rendered worthless, that Judge Smith's reliance damages award was not a valuation of the RAP right lost, and that, in any event, defendant's theory is unsupported by any evidence heard at trial. We held a status conference to discuss defendant's theory on November 8, 2023.

Although we can see how our footnote invited the government's argument, the reduction in the value of plaintiff's tax claim sought by defendant now is unmerited. The case went to trial on the assumption that the RAP right was rendered worthless by FIRREA. *See* 140 Fed. Cl. at 289-90 (stating that the Federal Circuit had already held that banks had some basis in the RAP right and that a deduction was owed if the value of the basis was proven). It is settled law that the contract right was breached. The thrifts were denied the benefits of those promises. Judge Smith's reliance damages award only compensated plaintiff for the increase in costs suffered on account of that broken promise, but not the loss of the asset for tax purposes. The treatment of these broken promises by tax and contract law do not intersect or overlap.

At heart, defendant has never been comfortable in this case with the

5

notion that a contractual promise gave rise not only to the right to sue for damages but also for a tax deduction for the loss of an asset, albeit one that seems more the product of accounting practices than economic reality. As Dr. Mann explained at trial, goodwill is recorded on an acquiring company's balance sheet to account for any amount of the purchase price that is beyond the market value of the assets of the acquired business. 166 Fed. Cl. at 752. In this case, there was some debate at trial whether it was appropriate to record goodwill from the merger with Broward given that it was a failing thrift. In fact, that goodwill was given a special characterization: "supervisory goodwill." There is no dispute, however, that the accounting rules and the federal regulators permitted the creation of such an asset on Glendale's books. The creation of that asset and subsequent regulatory treatment were central to the deal.

As we explained during summary judgment, the amount recorded as supervisory goodwill accounted for the RAP right and any other intangible assets not separately recorded on Glendale's books from the merger. 140 Fed. Cl. at 289-90. The Federal Circuit was unequivocal in stating that RAP rights represent a valuable intangible asset that was lost and could be deducted if the basis were proven. *WMI Holdings Corp.*, 891 F.3d at 1021. Citigroup did so at trial. It is thus entitled to a deduction for that full value. Our trial opinion should not be read otherwise.

Plaintiff is entitled to a tax deduction for its adjusted basis in the RAP right of $498,597,000 plus an exclusion from income for the recapitalization costs portion of the reliance damages that it did not previously deduct in the amount of $24,234,000. The parties agree that, if those inputs are correct, Citigroup is owed a tax refund for the 2005 tax year of $182,991,000. *See* Def.'s Status Rep. of Sept. 11, 2023 at 1 (ECF No. 199). Accordingly, the Clerk of Court is directed to enter judgment for plaintiff for a tax refund of $182,991,000 for the tax year ended December 31, 2005, plus statutory interest.

s/Eric G. Bruggink
Eric G. Bruggink
Senior Judge
